UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

IN THE MATTER OF AN APPLICATION          :          **FILED UNDER SEAL**

OF THE UNITED STATES OF AMERICA                     3:17mj1828(JGM)

FOR A SEARCH WARRANT FOR THE             :          NO. _____

PREMISES OF

48 Gibson Lane, New Hartford, Connecticut   :

### SEARCH WARRANT AFFIDAVIT

I, James M. Lawton, Special Agent, Federal Bureau of Investigation ("FBI"), being

duly sworn, state:

1.      I make this affidavit in support of an application for a warrant, pursuant to Rule

41 of the Federal Rules of Criminal Procedure, to search the residence of Andrea Dobrozensky

located at 48 Gibson Lane, New Hartford, Connecticut ("Subject Premises"), in connection with

an ongoing criminal investigation in Connecticut. As set forth herein, I believe there is probable

cause to search the Subject Premises more specifically described in Attachment A to this

affidavit and to seize the items identified in Attachment B to this affidavit, and that there exists

fruits, instrumentalities, and evidence of violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire

fraud), and 1956 (money laundering) and 31 U.S.C. 5324(a) (structuring financial transactions),

which may be referred to as the Subject Offenses.

### BACKGROUND AND EXPERIENCE OF AFFIANT

2.      I am a Special Agent with the FBI and have been so employed since May 1996.

Prior to joining the FBI, I was a Military Police Officer in the United States Army for

approximately four years. I was also a police officer in the City of Pittsburgh, Pennsylvania for

three years. During my tenure as a federal law enforcement officer, I have participated in investigations into financial fraud, fraud against the government, interstate transportation of stolen property, kidnapping, illegal distribution of controlled substances, homicide, extortion and crimes of violence perpetrated in furtherance of organized criminal activity. I also received instruction on probable cause as it relates to search and seizure warrants, and methods and practices of executing such warrants. I participated in the execution of search warrants of personal residences and businesses for personal and business records relevant to ongoing criminal financial investigations. Through my education, and my training and experience as a Special Agent, I have become familiar with the manner in which individuals and entities prepare and maintain both personal and business records.

## BACKGROUND REGARDING THE INVESTIGATION

3.     I am participating in a criminal investigation with Internal Revenue Service
Special Agent Maria Papageorgiou concerning the criminal activities of Dobrozensky and her
close associate David E. Raymond of Glastonbury, Connecticut.  Specifically, as explained
below, there is probable cause to believe that from approximately October 2008 to August 2013
Dobrozensky defrauded her employer,                                                   while she
worked as                                      The investigation has shown that Dobrozensky diverted
more than $1,000,000 from                to her and Raymond.

4.     I base this affidavit upon my personal participation in this investigation; review of
various documents, including FBI and IRS records; information provided to me by other Special
Agents, and other investigators; information contained in the personal tax returns of
Dobrozensky that were provided pursuant to Court order; and my own professional training and
expertise as a criminal investigator.  I have not included every fact that I have learned from this

2

investigation, but only those facts necessary to establish probable cause for the requested warrant. Unless otherwise noted, all statements set forth in this affidavit that are attributed to sources of information are stated in substance and part. Additionally, unless otherwise noted, information concerning physical surveillance is based either on my own participation in surveillance or on communications with other law enforcement officers.

5. I have participated fully in this investigation and, as a result of this participation, as well as information provided by other law enforcement officers and a forensic accountant, I am thoroughly familiar with the information set forth herein.

### The Facts



6. On November 12, 2013,            informed both the FBI and IRS that          Andrea Dobrozensky, had stolen over $1,000,000 from his medical practice. According to       he had a personal relationship with Dobrozensky from approximately 1994 to approximately 2007 and they had lived together.       told Special Agent Papageorgiou that from approximately October 1993 to her being fired in August 2013, Dobrozensky duties included paying business expenses and payroll, using business credit cards, maintaining Quick Books which categorize expenditures, filing quarterly tax returns, and running the medical office. An example of the fraud, as detailed below, is Dobrozensky diverting funds from       medical practice to pay her two mortgages (New Hartford and Glastonbury) and her sister       residential mortgage in Canton, Connecticut. Also, Raymond, who as explained in paragraph 18, had business relationship with

7. According to a Connecticut State Court opinion,

8.      The investigative team is seeking to determine the extent of the fraud by reviewing financial accounts and medical practice financial records, including the medical practice's Quick Books that Dobrozensky used and maintained while employed by ▮▮▮▮▮▮ To date, it appears that Dobrozensky used ▮▮▮▮▮ funds from various bank accounts to purchase personal items and to pay Dobrozensky's residential mortgage for the Subject Premises, her residential mortgage for 823 Manchester Road, Glastonbury, Connecticut, which is where Raymond resides, and her sister ▮▮▮▮▮ mortgage on a residence in Canton, Connecticut. These expenditures and transfers were disguised in the Quick Books as business related expenses. The expenditures indicate to me that Dobrozensky defrauded ▮▮▮▮▮ of his funds from as early as approximately October 2008 to August 2013. Based on what I know at this time, the amount of funds Dobrozensky stole from ▮▮▮▮▮ appears to have increased in 2010 to 2013 when ▮▮▮▮▮ was personally involved with his current wife.

9.      According to ▮▮▮▮▮ on August 27, 2013, he fired Dobrozensky as an employee of his medical practice because he had learned that she stole from him. ▮▮▮▮▮ maintained his business operating account at Bank of America (account number ending in 6463) and he maintained personal bank accounts at TD Bank. Each week ▮▮▮▮▮ took a ▮▮▮▮▮ draw as his salary from the Bank of America account and the funds were transferred to his personal account at TD Bank.

10.     After reviewing his personal bank statements at TD Bank, ▮▮▮▮▮ noticed there were numerous transfers in various increments each month. ▮▮▮▮▮ contacted TD Bank and discovered that Dobrozensky had opened a personal account at TD Bank (account number ▮▮▮▮▮ 5945), unbeknownst to him, in the name of ▮▮▮▮▮ and signed ▮▮▮▮▮ signature on the signature card without his permission. Also, Dobrozensky appears to

4

have added herself as a signor on the account. A November 5, 2011 letter on ████████

letterhead sent to TD Bank purportedly grants Dobrozensky access to all his accounts. ████

████ said he did not authorize or sign this letter. Therefore, I believe that Dobrozensky used

this letter as part of the scheme to defraud ████████ of money from his medical practice.

11.    A review of financial records revealed that Dobrozensky dispersed money from

████████ Bank of America business operating account ending in 6463 for her own personal

benefit. According to ████████ he did not authorize these expenditures. The Quick Books

entries for these payments showed business related expenses instead of the true expenditure for

Dobrozensky or someone associated with her. Here are some examples by date, vendor, amount

expended, and means of payment:

| May 6, 2009 | On line transfer to Andrea Dobrozensky | $ 2,900.00 | On line transfer to Dobrozensky's personal BOA account ending in number 7161 |
|---|---|---|---|
| July 13, 2009 | BMW Financial Services | $ 1,815.76 | Bill payment |
| August 6, 2009 | Traveler's Insurance | $ 1,271.00 | Electronic payment – telephone |
| January 29, 2010 | Cape Cod Fencing Memo – 48 Gibson Lane, New Hartford | $ 4,000.00 | Check # 25478 |
| April 12, 2010 | BMW | $ 1,795.76 | Bill payment |
| June 10, 2010 | Holloways, Inc. (Appliance Store) | $ 3,564.95 | Check # 25962 |
| February 2, 2011 | Home loans BOA | $ 1,509.42 | Bill payment |
| February 3, 2011 | Northeast Utilities | $ 75.80 | Bill payment |
| February 9, 2011 | ████████ | $ 410.99 | Check # 26828 |
| February 4, 2011 | Online transfer | $ 586.00 | Online transfer to Dobrozenski's BOA account ending in 7161 |
| March 3, 2011 | ████████ | $ 1,250.00 | Check # 26916 |
| December 31, 2011 | ████████ | $ 160.00 | Check # 28104 |
| December 31, 2011 | ████████ | $ 200.00 | Check # 28105 |

5

| December 31, 2011 | | $ 200.00 | Check # 28106 |
| January 27, 2012 | Verizon Wireless | $ 576.88 | Electronic check payment |
| February 2, 2012 | Home loans – BOA | $ 1,509.42 | Bill payment |

Dobrozensky appears to have signed the December 31, 2011 checks to ████████ endorsing them to the estate of ████████ who had died in July 2011 and who was not an employee of ████████ medical practice. Also, on October 28, 2008, a payment in the amount of $1,509.41 was made to a Bank of America mortgage for a property located at 823 Manchester Road, Glastonbury, Connecticut, which according to Glastonbury property records is owned by Andrea Dobrozensky and which is where David Raymond resides. In addition, from November 1, 2010 to March 1, 2012, 15 monthly mortgage payments from the business operating account were made toward the same Glastonbury residence owned by Dobrozensky in the amount of $1,509.42 for a total of $22,641.30. ████████ said he did not authorize these mortgage payments.

12.    Based on the investigation, Dobrozensky transferred money from ████████ Bank of America business operating account ending in 6463 to the fraudulently opened TD Bank account number ████ 5945 in her and ████████ name, and she utilized the money from that account for her own personal use. According to ████████ he did not know about this TD Bank account and he said the signature on the account card is not his signature. A review of TD Bank account number ████ 5945 between May 16, 2012 and August 11, 2013 shows numerous deposits being transferred and/or deposits being made into this account. Here are some examples by date, vendor, amount expended, and means of payment:

| February 25, 2013 | Derwin Clothiers Litchfield, CT | $2,486.46 | Debit Card |
| March 7, 2013 | Saks Fifth Avenue 0001 New York, NY | $ 620.02 | Debit Card |
| March 19, 2013 | Valley Energy | $ 824.80 | Debit Card |

6

| March 22, 2013 | BMW Financial SVS | $ 893.05 | Electronic payment – telephone |
| March 25, 2013 | Bradford House Antiques | $ 1,000 | Debit Card |
| April 1, 2013 | Derwin Clothiers Litchfield, CT | $ 526.43 | Debit Card |
| April 15, 2013 | Klaff's Inc., Norwalk, CT | $ 151.34 | Debit Card |
| June 10, 2013 | J Namnoun Oriental Rug | $ 3,000 | Debit Card |
| June 13, 2013 | BMW Financial SVC | $ 893.05 | Electronic payment – telephone |
| July 18, 2013 | BMW Financial SVC | $ 2,679.15 | Electronic payment – telephone |

13. A review of the available records of ▮▮▮▮ business Bank of America credit card ending in 5253 shows that Dobrozensky used the card to purchase items for her personal benefit. ▮▮▮▮ medical practice paid these bills and he did not authorize the charges. A sampling of the date, vendor, and amount charged on the credit card is outlined below:

| February 18, 2010 | Klaff's Inc. | $ 1,141.03 |
| April 30, 2010 | Verizon Wireless | $ 264.22 |
| October 10, 2010 | R. Derwin Clothiers Litchfield, CT | $ 1,894.22 |
| February 19, 2011 | R. Derwin Clothiers Litchfield, CT | $ 1,709.78 |
| February 21, 2011 | Verizon Wireless | $ 69.91 |
| July 16, 2011 | Saks Fifth Ave NY, NY | $ 1,110.47 |
| January 24, 2012 | Moscarillo's Garden West Hartford, CT | $ 289.79 |
| June 7, 2012 | French Cleaners, Inc. West Hartford, CT | $ 92.55 |
| October 5, 2012 | SXM Sirius XM NY, NY | $ 190.38 |
| January 31, 2013 | Dermatology Assoc. Glastonbury, CT | $ 180.00 |
| February 25, 2013 | SXM Sirius XM NY, NY | $ 364.07 |

14. ▮▮▮▮ medical practice had two American Express cards issued to ▮▮▮▮ (account ending 82008) and Dobrozensky (account ending 82016). A review of the

records shows that Dobrozensky used the card issued in her name to purchase items for her personal benefit. Dobrozensky paid the credit card bill with funds from ████████ A sampling of the date, vendor, and amount charged on the credit card is outlined below:

| August 28, 2010 | Derwin Clothiers Litchfield, CT | $ 707.02 |
| August 30, 2010 | Verizon Wireless | $ 198.54 |
| August 27, 2011 | R. Derwin Clothiers Litchfield, CT | $ 3,548.51 |
| December 17, 2011 | R. Derwin Clothiers Litchfield, CT | $ 5,013.30 |
| December 23, 2011 | The Meat House Avon, CT | $ . 212.75 |
| March 9, 2012 | Friedrich's Optik Palm Beach, FL | $ 2,643 |
| March 11, 2012 | R. Derwin Clothiers Litchfield, CT | $ 3,007.58 |
| December 30, 2012 | Bradford House Antiques Litchfield, CT | $ 4,360.35 |
| June 25, 2013 | Saks Fifth Avenue NY, NY | $ 826.35 |
| July 12, 2013 | Friedrich's Optik Palm Beach, FL | $ 1,983 |

15.     Based on the review of ████████ Quick Book records shows that from approximately September 7, 2007 to April 28, 2008, Dobrozensky wrote 23 checks to herself from ████████ business operating account at Bank of America totaling approximately $380,000. The check amounts ranged from $3,100 to $100,000 and the Quick Books entries show the notation New Hartford, which I interpret as the Target Premises and which entries do not appear to have been disguised. Further investigation will be done to determine if these expenditures were authorized by ████████

16.     A review of the financial records related to ████████ business practice identified some transactions from the Bank of America business account ending in 6463 that appeared suspicious and require further investigation. For example, on March 26, 2007, $897.88

8

was paid to BMW Financial Services by means of an electronic payment. The Quick Books entry listed the payee as "Muzak" and the expenditure description as "telephone." Also, electronic transfers on October 9, 2007 in the amount of $4,200 and on October 17, 2009 in the amount of $5,000 were made to Dobrozensky's Bank of America account ending in 7161. The Quick Books entries for the medical practice indicate the $4,200 expenditure was for "repairs: computer and postage and delivery" and the $5,000 expenditure was for "supplies: medical." Another expenditure on August 14, 2008 was an online banking transfer in the amount of $2,695 to Dobrozensky personal checking account ending in 7161 and the Quick Book entry lists the payee as ▮▮▮▮▮▮▮ with the description "PBM's draw." Therefore, it appears Dobrozensky disguised the theft of $2,695 to her account as payment to ▮▮▮▮▮▮

17.    In addition, ▮▮▮▮ said that he believed Dobrozensky's annual salary was approximately $100,000. Dobrozensky was responsible for writing salary checks for ▮▮▮▮ employees, including herself. After Dobrozensky was fired, ▮▮▮▮ learned that she had increased her salary to $200,000 a year, unbeknownst to him. [Dobrozensky's federal tax return returns filed with the IRS shows that in 2011 she had wages of ▮▮▮ from ▮▮▮▮ and in 2012 she had wages of ▮▮▮ from ▮▮▮▮. Dobrozensky also opened up two lines of credits with TD Bank (accounts ending in 9001 and 7074) in ▮▮▮▮ name. One of the lines of credit was to be used to purchase medical equipment. One credit line was for $100,000 and the other was for $200,000. Dobrozensky used funds from these two lines of credit for her and Raymond's personal benefit.

18.    Raymond has been involved in many business ventures, including as an antiques dealer, car salesman, and golf equipment sales man. ▮▮▮▮ had paid Raymond $5,000 a month to be a picker and find items for him. ▮▮▮▮ also provided Raymond with a pick-up

9

truck. Raymond sold █████████ various rock and roll memorabilia and artwork. According to ██████████. Raymond wanted all payments to be under $10,000 to avoid the filing of a form. ██████████ said that he paid Raymond approximately $364,000 from 2008 to 2013 in checks ranging from $190 to $9,850, with the majority exceeding $5,000.

19.     In November 2012, Dobrozensky and Raymond were involved in structuring financial transactions with respect to the estate of ██████████, who is Andrea's sister and who died on July 26, 2011. Dobrozensky and Raymond went into Farmington Bank in Avon, Connecticut. Raymond instructed Dobrozensky to make checks payable in amounts less than $10,001 from her bank account. Raymond said that he had been told by a teller at another bank to keep cash deposits under $10,000. Dobrozensky wrote six checks on her account to herself, Raymond, her sister █████████ and her brother-in-law █████████ in amounts ranging from $3,688.65 to $9,900 and totaling $46,927.29. She then cashed the two checks made payable to herself in the amounts $3,688.65 and $9,900. Raymond also cashed a check made payable to him in the amount of $9,900. After receiving the cash in November 2012, Dobrozensky and Raymond discussed wrapping the money in foil and keeping it in the freezer. Investigators understand that these funds are from the █████████ estate.

20.     On November 19, 2013, based on an application, U.S. Magistrate Judge Joan Glazer Margolis issued an Ex Parte Order directing the IRS to disclose to the U.S. Attorney's Office, me, and IRS Special Agent Papageorgiou Dobrozensky's and Raymond's tax returns and tax information for 2007 through 2012. To date with respect to Andrea Dobrozensky's tax returns, the IRS has provided the 2011 and 2012 tax returns, but not the 2007 through 2010 tax returns. With respect to Dobrozensky, the filed U.S. Individual Income Tax Return for 2011

10

reports wages of ▊ from ▊ and the filed U.S. Individual Income Tax Return for 2012 reports wages of ▊ from ▊ .

21.     The investigation has determined the following concerning the use of the mails and interstate wires in furtherance of the fraudulent scheme. According to a representative of TD Bank, all electronic transfers of money such as by debit card, electronic payments, and electronic checks are done through a server in Canada. In addition, according to ▊ , TD Bank mailed bank statements to ▊ medical practice in Hartford, Connecticut., and Dobrozensky directed the medical practice staff to not open the bank statements and to deliver them to her. For the period from June 2010 to November 2010, at Dobrozensky's direction, Bank of America mailed the business operating account statements to her at the Subject Premises. According to a representative from Bank of America, with respect to its paper checks, they are cleared through a center in New Jersey. Therefore, with respect to the conduct here, interstate electronic wires and the U.S. mail were used in furtherance of the fraud.

22.     According to the Connecticut Department of Labor, Dobrozensky sought unemployment compensation benefits after being fired by ▊ We are seeking to get any records from the Department of Labor concerning any unemployment claims she may have filed.

23.



The agents asked her about the financial transactions concerning her deceased sister's estate. According to the agents, Dobrozensky said that she wrote two checks – one to herself and one to her other sister

11

[which is not accurate because she wrote six checks in amounts less than $10,001], that Raymond was with her during the transaction, and that she did not remember any conversation with her and Raymond relating to making smaller financial transactions or hiding money to avoid reporting requirements or paying taxes.

### Location of Records to Be Seized

24.     Based on my training and experience, and as corroborated during the course of the investigation, I know (1) that homeowners tend to keep their records in their residences for safe keeping and (2) that they generally keep these records for many years to consult and review as needed in deciding how to handle their personal finances and to review prior purchases and transactions.

25.     Based on my experience as a criminal investigator, I know that people maintain the following records and documents, (including those contained in Attachment B) among others, in locations they feel are safe from the scrutiny of others, including law enforcement but still under their control:

   a) records relating to construction and acquisition of items for a residence;

   b) records of income and expenditures;

   c) records of the accumulation of assets and liabilities, including real and personal property, mortgages and other loans; and

   d) records of banking transactions, including but not limited to deposits, withdrawals and loan activity.

26.     Based upon my training and experience, I have found that those who embezzle or steal from a business often disguise it as legitimate transactions to eliminate drawing attention to the transactions. I have also found that people employ many tactics to conceal the misappropriated money, including but not limited to the alteration and falsification of records.

12

In addition to other information already set forth in this affidavit, the following facts uncovered during the course of this investigation establish that there is probable cause to believe that Andrea Dobrozensky keeps records which may constitute evidence, fruits and instrumentalities of criminal offenses and contain evidence relevant to the crimes under investigation as more fully described herein, at the Target Premises, 48 Gibson Lane located in New Hartford, Connecticut:

> a) An examination of financial documents indicates that Dobrozensky has a current and continuous relationship with the property located at the Subject Premises;
>
> b) On Dobrozensky's e-filed 2012 U.S. Individual Income Tax Return, Form 1040, she lists Subject Premises as her home address.

27.     The investigative team intends to conduct interviews of David Raymond and Dobrozensky's tax return preparer, who is also       accountant, at the same time the search warrant is executed should the Court authorize the search. It is reasonable to conclude, and I do conclude, that the records and documents sought to be seized at Dobrozensky's residence will be destroyed or otherwise placed beyond the reach of the Government if a warrant to search and seize records from the Subject Premises.

28.     I have met a person who has provided reliable information to law enforcement officers in the past (referred to as "CW-1"). The information CW-1 has provided has been determined to be reliable, either by the corroboration of their information through other investigation by the FBI, by other law enforcement officers, or by other means, and has not been determined to have given false information. CW-1 said that he/she visited the Subject Premises in early 2013. CW-1 told law enforcement that while inside the Subject Premises, he/she saw a

13

room that Dobrozensky uses as an office and he/she saw an Apple computer inside the Subject Premises.

29.     Based on my training and experience and discussion with other special agents, I know that people ordinarily maintain at their residence those kind of financial records listed in the accompanying Attachment B and that they generally keep those records for many years to consult and review as needed in deciding how to handle their personal finances and to memorialize the payment of bills. Some of the records, such as capital improvements to real estate are maintained at least until the real estate is sold so as to establish a cost basis for the property. In addition, people who purchase items generally retain receipts, invoices, bill of sales, and documentation concerning the purchases in the event the purchased item needs to be exchanged, repaired, replaced, or valued for insurance purposes. Therefore, probable cause exists to believe that receipts, invoices, bills of sale, and documentation concerning the purchase of items or payment of bills are within the Subject Premises.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

30.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the Subject Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

31.     *Probable cause.* I submit that if a computer or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

          a)  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

          b)  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

15

c) Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d) Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e) Based on actual inspection of other evidence related to this investigation, I am aware that computer equipment was used to generate, store, and print documents used in the scheme. There is reason to believe that there is a computer system currently located on the Subject Premises.

32.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Subject Premises because:

a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a

16

file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b) Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

17

    d)  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e)  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

33.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

18

a) The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b) Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c) Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

34.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

19

storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

35.    I have no information that anyone other than Dobrozensky lives in the Subject Premises. It is possible that the Subject Premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## REQUEST TO SEAL

36.    I request that the search warrant application and this affidavit be sealed. The investigation of the criminal activities of Dobrozensky and Raymond is ongoing. Premature disclosure of the contents of this affidavit would frustrate and negatively impact this investigation by alerting the targets of the investigation to the nature of the probe, the techniques employed, and the evidence developed to date, and by limiting the use of the grand jury to develop further admissible evidence. Therefore, I respectfully request that this Court seal until further order of the Court this affidavit, the application, and accompanying search warrants, except that a copy of the search warrant be provided to Dobrozensky and/or left at the Subject Premises as provided by the Criminal Rules of Criminal Procedure.

20

## Conclusion

37.     Based on the foregoing, I submit that this affidavit supports probable cause for a

warrant to search the Subject Premises described in Attachment A and seize the items described

in Attachment B, which constitute evidence, instrumentalities, and fruits of violations of the

Subject Offenses.

Respectfully submitted,



Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 12th day of December 2013, at
New Haven, Connecticut.

/s/ Judge Joan G. Margolis
JOAN GLAZER MARGOLIS
UNITED STATES MAGISTRATE JUDGE

21

## ATTACHMENT A

## DESCRIPTION OF THE SUBJECT PREMISES

### 48 Gibson Lane, New Hartford, Connecticut

The Subject Premises is the residence of Andrea Dobrozensky, located at 48 Gibson Lane, New Hartford, Connecticut, including the surrounding grounds, any garages, sheds, storage rooms, storage lockers, trash containers, and any outbuilding located thereon, described as follows:

The residence is a newly constructed two- story single family residence purchased in 2008. It is approximately 4,320 square feet and contains a total of 10 rooms, including four bedrooms and 2½ bathrooms. The residence appears to be grey in color. The entire property encompasses approximately 4.15 acres of land. It is situated at the end of Gibson Lane and is behind an approximate four foot rail fence and gate. A garage is attached to the right of the front entrance. A photograph of the Subject Premises reportedly taken in 2009 appears below.



## ATTACHMENT B

### ITEMS TO BE SEIZED

#### 48 Gibson Lane, New Hartford, Connecticut

The items to be seized from 48 Gibson Lane, New Hartford, Connecticut is for the time period October 2008 through the present, in document or electronic form and in the name of, or pertaining to the interest of Andrea Dobrozensky, ███████████████, David Raymond, ██████, and/or ████████████ is as follows:

a) General ledgers, cash receipts journals, cash disbursement journals, petty cash journals, bank statements, appointment books, calendars, passbooks, cancelled checks, check stubs or registers, deposit tickets, deposit receipts, cashier's checks, money orders, wire transfer documents, invoices, written estimates, receipts, contracts, agreements, customer ledger cards, purchases journals, advance payment ledgers, accounts payable ledgers, accounts receivable ledgers, correspondence, memoranda and documents;

b) Copies of and/or original federal and state income tax returns and informational returns, including amended federal and state tax returns, as well as any and all records used in, or resulting from, the preparation of federal and state income tax returns, consisting of but not limited to work-papers, notes, papers, memoranda and correspondence;

c) Records of income and expenses, such as profit and loss statements, financial statements, balance sheets and income and expense journals, and documents pertaining to cash expenditures;

d) Any and all documents relating to real estate transactions for 48 Gibson Lane, New Hartford, Connecticut, 823 Manchester Road, Glastonbury, Connecticut (where Raymond's resides, 32 Oakridge Road, Unionville, Connecticut (████ residence), and the residence of ████████ in Canton, Connecticut including but not limited to loan applications, purchase and sale agreements, receipts issued for down payments, deposits or other exchange of funds, copies of checks, all correspondence, papers, or other files relating to the sale or sales; mortgage records relative to the purchase of the property and any other mortgages or loans, including applications, financial statements, the mortgages or loans, including applications, financial statements, the mortgages, loan contracts or note, the annual amount of interest paid, records which indicate the location of the property, dates of the real estate closing, and the name of the parties to the real estate transactions; real estate appraisals, loan proceeds, loan working papers, wire transfer applications and advances, invoices, deeds and property lien records, and title history search documentation;

e) Records, including but not limited to bank statements, passbooks, check stubs, check registers, cancelled checks, cashier's checks, money orders, statements, deposit tickets, deposit receipts, and withdrawal slips for the Bank of America account numbers ending in 6463 and 7161), Bank of America credit card account ending in 5253, TD Bank

account number �as⬛ 5945, and credit line accounts ending in 9001 and 7074, American Express accounts ending in 82008 and 82016, and any other bank accounts;

f) Stock purchase records, including all agreements, contracts, applications for account, signature cards, all records relative to treasury notes or certificates of deposit purchased, cash accounts, ready asset accounts, mutual fund accounts, commodity accounts, margin accounts, or other accounts. Such records including cash receipts, confirmation slips, securities delivered receipts, statements of account, notifications of purchase or sale representative's stock record, account executive worksheets, correspondence, ledger sheets, cash in slips, buy and sell slips, or other records of these transactions. Other records revealing a description of the securities transacted, quantity bought or sold, date of transactions, purchase or sales price, and commissions paid;

g) Loan records for properties in subparagraph (d), including applications, financial statements, loan collateral, credit and background investigations, loan agreements, notes or mortgages, settlement sheets, contracts, checks issued for loans, repayments records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loan correspondence files, and internal bank memoranda;

h) Safe deposit records, including contracts, access records, and records of rental fee paid disclosing the date, amount, and method of payments (cash or check);

i) Certificates of deposit and money market certificates, including applications, actual instruments(s), records of purchases and redemption's, checks issued on redemption, checks used to purchase certificate, any correspondence and any Forms 1099 issued, records revealing the annual interest paid or accumulated, the dates of payment or date interest is earned, checks issued for interest payments;

j) U.S. Treasury notes and bills, any records of the purchase of U.S. Treasury Bills and Notes and/or subsequent sale of such bills or notes, including interest paid, checks used for the purchase or sale of the notes and bills, Forms 1099 issued, checks issued for interest payments, records of interest paid or accumulated revealing the dates and amount of interest paid or accumulated;

k) Credit card records, including application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and methods (cash or check) of repayment, checks used to make repayments (front and back) for Bank of America credit card account ending in 5253 and American Express accounts ending in 82008 and 82016, and any other accounts;

l) Purchases of bank checks, cashier, teller, travelers check records, or money order records including the check register, file copies of the checks or money order records including

the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders;

m) Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through your bank, savings bond transactions and investment accounts. Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments and statements of transactions;

n) U.S. currency in a freezer and U.S. currency totaling more than $10,000;

o) All computer equipment and peripherals that may be interdependent, the software to operate the computer system, related instruction manuals that contain directions concerning the operation of the computer system, the software programs, and all electronically stored or computerized computer data; and

p) All magnetic storage devices, the centralized processing units (CPU's) and all input-output devices.

q) All computers, handheld devices, or other electronic devices used to store items to be seized or capable of creating, storing, or modifying any items described above including any electronic storage media, networking equipment, or other peripheral hardware that is compatible with such computers or devices.

r) Any password or security device that can be used to control or obtain access to any item described in paragraphs (o) through (q).

All of which constitutes evidence, instrumentalities, and fruits of violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1956 (money laundering) and 31 U.S.C. 5324(a) (structuring financial transactions).

25

## ATTACHMENT C

### DEFINITIONS

For the purpose of this Warrant:

  1. "Computer hardware" means: electronic devices capable of data processing (such as laptop and desktop computers, personal digital assistants ("PDAs"), and wireless communication devices); peripheral input/output devices (such as keyboards, printers, scanners, monitors, and drives intended for removable storage media); related communications devices (such as wireless cards, modems, cables, and connections), and security devices, (such as electronic data security hardware and physical locks and keys).

  2. "Computer software" means: programs, program codes, information and data stored in any form (such as operating systems, applications, utilities, communications and data security software; log, history and backup files; encryption codes; user names; and passwords), whether deliberately, inadvertently, or automatically stored.

  3. "Storage media & devices" means: any media capable of collecting, storing, retrieving, or transmitting data (such as hard disks, floppy diskettes, CDs, DVDs, tapes and memory cards).

  4. "Data" means: all information stored on storage media of any form (such as documents, tables, metadata, audio and visual files, their drafts and their modifications, whether deliberately, inadvertently, or automatically stored).